THE HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| MAURICIO A. LEON, M.D.,<br><br>  Plaintiff,<br>vs.<br><br>IDX SYSTEMS CORPORATION, a Vermont corporation,<br><br>  Defendant. | NO. CV03-1158P<br><br>PLAINTIFF'S SUBMISSION OF DEPOSITION EXCERPTS RELEVANT TO IDX'S SPOLIATION MOTION |

Plaintiff Mauricio A. Leon is a good and highly-principled man. His unbending principles and his innate sense of right and wrong drove his whistleblowing activities that are at the heart of this case.

As admitted at the hearing, Dr. Leon made a mistake in deleting materials on his IDX-issued laptop, a mistake caused by concerns about personal data on that computer. The deposition excerpts submitted by IDX establish that Dr. Leon:

- "Didn't delete anything that I didn't think was personal." (May 13, 2004 Transcript at 75, l. 25).

- "Never ever deleted anything related to SAGE." (May 13, 2004 Transcript at 82, l. 2).

PLTF'S SUBMISSION OF DEPOSITION EXCERPTS RELEVANT TO IDX'S
SPOLIATION MOTION - 1 of 3
(CV03-1158P)
[1282296 v1.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON 98401-1157
(253) 620-6500 - FACSIMILE (253) 620-6565

- "[Wanted to get rid of stuff off the computer] because I didn't want any personal information to be seen and something like this to happen." (May 13, 2004 Transcript at 111, l. 11-17).
- "Never thought I was dealing with the evidence." (May 14, 2004 Transcript at 294, l. 8-9).

As the Court considers IDX's current motion, Dr. Leon respectfully requests that the Court consider:

- The deposition excerpts submitted by plaintiff along with this submission, which run approximately 28 minutes. A transcript of the excerpts is also attached. Those excerpts give a glimmer of the angst and emotional distress suffered by Dr. Leon as a result of retaliation for his whistleblowing activities, and will assist the Court in determining Dr. Leon's credibility and his mental state.
- The pending summary judgment motions. A review of those motions will: (a) give the Court an opportunity to become familiar with the sincerity, breadth, detail and persistence of Dr. Leon's whistleblowing activities; and (b) given the Court a better context within which to consider IDX's current motion.

In addition, tomorrow plaintiff will submit a memorandum concerning potential monetary sanctions, and other recent developments, concerning the pending motion.

Dated this 14th day of September, 2004.

GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP

By   s/Kenneth G. Kieffer
    Kenneth G. Kieffer, WSBA No. 10850
    kkieffer@gth-law.com
    Albert R. Malanca, WSBA No. 01226
    Timothy L. Ashcraft, WSBA No. 26196
    tashcraft@gth-law.com
    Attorneys for Plaintiff

PLTF'S SUBMISSION OF DEPOSITION EXCERPTS RELEVANT TO IDX'S
SPOLIATION MOTION - 2 of 3
(CV03-1158P)
[1282296 v1.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON 98401-1157
(253) 620-6500 - FACSIMILE (253) 620-6565

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2004, I electronically delivered the foregoing to the following: M. Edward Taylor at etaylor@sebrisbusto.com, Rick Kaiser at rkaiser@sebrisbusto.com, Lisa N.W. Dublin at ldublin@sebrisbusto.com, Angelo J. Calfo at acalfo@yarmuth.com, Michelle K. Peterson at mpeterson@yarmuth.com, Michael Rosenberger at mrosenberger@yarmuth.com, and Jordan Gross at jgross@yarmuth.com, counsel for defendant IDX in the above case.

*Leslee C Hoober*
Leslee E. Hoober, Legal Assistant
GORDON THOMAS HONEYWELL
MALANCA PETERSON & DAHEIM
   1201 Pacific Avenue Suite 2100
   Tacoma WA 98402
   253-620-6500
   253-620-6565
   Attorneys for Mauricio A. Leon

PLTF'S SUBMISSION OF DEPOSITION EXCERPTS RELEVANT TO IDX'S
SPOLIATION MOTION - 3 of 3
(CV03-1158P)
[1282296 v1.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON 98401-1157
(253) 620-6500 - FACSIMILE (253) 620-6565

# TRANSCRIPT OF DEPOSITION EXCERPTS

TRANSCRIPT OF DEPOSITION EXCERPTS

1  [redacted]
2  [redacted]
3  [redacted]
4  [redacted]
5  [redacted]
6  [redacted]
7  [redacted]
8  [redacted]
9  [redacted]
10 [redacted]
11 [redacted]
12 [redacted]

13      Q.    (By Mr. Calfo)  Dr. Leon, let me -- I'll let you
14 put your microphone back on.
15           How much money -- As you sit here today, you're
16 asking for money to compensate you for emotional distress;
17 right?
18      A.    (Witness nodded.)
19      Q.    Yes?
20      A.    Yes.
21      Q.    How much money do you want for that?
22      A.    I don't remember the exact amount that we
23 determined.  I would like to go with that because that was the
24 result of a thoughtful process.  I think is between 500,000
25 and million.  And.

1    Q.   And as you sit here today, would $500,000 be
2 sufficient for you, in your own mind?
3    A.   It is possible.
4    Q.   Okay.  Would $100,000, would that make you -- Would
5 you feel that you had been compensated if you were paid that
6 much money?
7         MR. KIEFFER:  Objection as to form.
8         THE WITNESS:  No, I don't think so.
9    Q.   (By Mr. Calfo)  Why do you think your -- you
10 deserve $500,000 in emotional distress damages?
11   A.   Because unfortunately the system only can do that
12 to make people what they were; if there were other means, I'd
13 rather have those means.
14   Q.   Is it -- Do you mean you'd rather have something
15 other than money?
16   A.   Oh, yes.
17   Q.   But given the fact that you've asked for money, why
18 would $500,000 be -- why do you deserve $500,000?
19   A.   Because I have suffer a lot.
20   Q.   Could you explain that for me?
21   A.   Because every day of my life -- because every day
22 of my life and my family's life, since about 2002, the
23 beginning, I've had agony that didn't have to be there.
24   Q.   I'm sorry; you had what?
25   A.   I had agony that didn't have to be there because

1  this was done.  Yeah; it was not an accident and because it's
2  only the method that the system seems to provide.
3           I think that's the reason.
4       Q.  Other than -- Okay; so, one reason you think you're
5  entitled to a half million dollars is the agony that you
6  suffered as a result this; right?
7       A.  Yes.
8       Q.  And when do you believe you started to suffer that
9  agony?
10      A.  I think I started with -- suffer with this project
11 at about the time I wrote this memo.
12      Q.  What day was that?
13      A.  February of 2002; February 14th.  And then, it just
14 grew from that moment on to levels that I never imagined.
15      Q.  Was there any single event that occurred since the
16 February memo that was, in your mind, the most significant
17 cause of your damages?
18      A.  There's not a single event; there are several which
19 are all relevant to the damages.
20      Q.  The fact that you were --
21          MR. KIEFFER:  Had you completed your answer?
22          THE WITNESS:  Yes.
23          MR. KIEFFER:  Okay, thank you.
24      Q.  (By Mr. Calfo)  The fact that you were asked to
25 leave the building in September of 2002, was that one of the

1  significant events that lead to your harm, emotional harm?
2      A.   Oh, yes.
3      Q.   Would you rank that, if you were going to rank it
4  among the other events, would that be the top one?  Would that
5  be the most significant thing?
6      A.   That would be very significant.
7      Q.   Is there any other event here, that approximates
8  that one --
9      A.   Oh, yes.
10     Q.   -- in terms of causing you harm?
11     A.   Yes.
12     Q.   What's that?
13     A.   I read a document that was written by one of the
14 persons which is in your -- it says it's defending IDX and
15 this document is one of the most insulting and miserable
16 things I've seen in my life.  And this was...
17     Q.   Is this the report of Dr. Lipscomb?
18     A.   No.
19     Q.   What are you referring to?
20          MR. KIEFFER:  He hadn't finished.
21     Q.   (By Mr. Calfo)  What are you referring to?
22     A.   It's a document that was authored by Mr. Taylor, I
23 believe.
24     Q.   Okay.  This is the -- Is this the -- Could you
25 describe this document for me?

1    A.    I didn't -- couldn't read the document because I
2    couldn't in its entirety, but I am basically a criminal there.
3    Q.    Was this a lengthy letter?
4         MR. KIEFFER:  Had you finished?  I'm sorry; had you
5    finished?
6         THE WITNESS:  No.  I am treated like a person
7    without morals and sociopath, psychopath, a person without any
8    regard for any value, a person that was doing this out of the
9    words of reasons.  And that is very painful.
10   Q.    (By Mr. Calfo)  And If I could ask you, just to
11   speak up just a bit; I'm sorry.
12        So, was this a lengthy letter that Mr. Taylor wrote
13   to Vickie Coleman?
14   A.    Yes.
15   Q.    And it had a number of documents attached to it, as
16   well?
17   A.    I think so.
18   Q.    So, is this the -- Would you describe having read
19   that, as the -- as significant in terms of causing you harm,
20   as being placed on leave and being walked out of the building?
21   A.    No.
22   Q.    Okay.  Would you rank that second behind being
23   walked out of the building, in terms of distressing events?
24   A.    No.
25   Q.    Okay.  What -- Maybe you can -- How, where do you

1  put it in the scale of events that occurred?
2      A.   Perhaps, third.
3      Q.   And what is the second?  What was the second most
4  distressing event?
5      A.   I will have to say when I was asked to resign, when
6  I was shown that I was going to be blamed for whatever fault
7  there were in the SAGE project, when what I said in good faith
8  was used against me and that is on September 6th, the document
9  that Mr. Krassner put that day of.
10     Q.   So, the most significant stressful event was being
11 walked out of the building; is that true?
12     A.   Yes.
13     Q.   Okay.  And the second most stressful event was the
14 time when you -- Mr. Krassner met with you and showed you the
15 document that he mailed out, saying you had resigned; correct,
16 that experience there?
17     A.   The document was part of it; the experience of
18 being there.
19     Q.   Okay.  And the third most stressful event was
20 reading Mr. Taylor's letter to Ms. Coleman?
21     A.   Yes.
22     Q.   Are there any other events that occurred that
23 approximate those three?
24     A.   Yes.
25     Q.   What?  Can you -- Please, name the next one.

1    A.    Probably, to receive and to read the action that
2  IDX started against me, the language and the way it was
3  presented to the public record of what was I; that was bad.
4    Q.    So, the fourth item you mentioned is the reviewing
5  the Complaint that IDX filed against you in April 2003?
6    A.    Receiving it, too.
7    Q.    Are there any other events that approximate these?
8    A.    When I was asked to leave the building for the
9  second time.
10   Q.    This was when you returned to the office earlier
11 than IDX had anticipated; was that right, originally?
12   A.    Yes.
13   Q.    And that was, I believe, in about October of 2002;
14 am I wrong or is that the November date?
15   A.    I think it was in November.
16   Q.    November; mid-November of 2002?
17   A.    Yes.
18   Q.    All right.  And then, how about, is there another
19 event that occurred during this time period that approximates
20 the ones you've just listed?
21   A.    Every time I read a document that IDX writes about
22 me.  And I remember reading the release by the IDX spokeswoman
23 calling me a prickly malcontent employee, as a justification
24 for all that happened.  That was painful.
25         And I also remember going back into the office and

1  being a non-entity there; that was painful.  And I remember
2  the fear that I had once I returned to the office, continued
3  fear; and that was painful.  There are many things.  And I
4  remember the night when I left my home -- when I left my home
5  on Bainbridge Island; that was painful.
6         I'm sorry.
7         (Witness left the room.)
8         THE VIDEOGRAPHER:  We are going off the record; the
9  time is approximately 2:08 p.m.
10         (Brief break.)
11         THE VIDEOGRAPHER:  We are back on the record.  The
12  time is approximately 2:14 p.m.
13         Go right ahead.
14      Q.   (By Mr. Calfo)  I want you to know, Dr. Leon,
15  thanks for coming back and if you feel like you need to take a
16  break at any time during this discussion, please feel free to
17  do it.
18      A.   Thank you.
19      Q.   Okay, go ahead; that's essentially what my question
20  was going to be.
21      A.   I apologize.  That night, I had finish loading the
22  truck and I was in my home alone and I felt a lot of anger
23  because for the first time in my life, I had been forced to do
24  something like this, when I didn't want to.  And I felt very
25  bad for that.  I think that many people in this company had

1  been very nasty to me and I have suffer for that.
2     Q.   Are you finished, Dr. Leon?
3     A.   Yes.
4     Q.   Are there any other events, significant events that
5  make up or result in your claim for emotional distress?
6     A.   Yes.
7     Q.   Could you describe them, please?
8     A.   I felt very miserable when I was diagnosed with a
9  disorder that I shouldn't have.  I felt very miserable when I
10 have to start taking pills.  They happen on the same date.
11           I felt very miserable every time I made my wife
12 miserable for what is happening to me in relation to this
13 company.  I felt very miserable because I couldn't take
14 pictures of my children.  Yeah; that make me very miserable,
15 because I could do that and then, I couldn't.
16           And I feel miserable every day.  There are so many
17 people that are trying to harm me and I haven't done anything
18 to them.  I don't know.
19           Sorry.
20           MR. KIEFFER:  Do you want to take a break?
21           THE WITNESS:  Yes, yes.  I have to go.
22           THE VIDEOGRAPHER:  We are going off the record; the
23 time is approximately 2:19 p.m.
24           (Brief break. )
25           THE VIDEOGRAPHER:  Back on the record; the time